UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PAUL WELDNER, TIMOTHY DUTTON, MICHAEL BURGESS, and LINDSEY SCHMIDT, on behalf of themselves and others similarly situated, Plaintiffs, | ) | |
| v. | ) | Civil Action No. 12-11771-DPW |
| EDWARD T. O'LEARY, in his individual and official capacity, and the TOWN OF FOXBOROUGH, Defendants. | ) | |

**AMENDED COMPLAINT**

**INTRODUCTION**

1. This is a civil rights class action for money damages against Edward T. O'Leary, the police chief of the Town of Foxborough, and the Town of Foxborough for establishing a policy causing police officers to unlawfully take and hold people in protective custody at Gillette Stadium events. Pursuant to this policy, over one thousand people were handcuffed, confined in a secure lockup, and held for prolonged periods at stadium events because a police officer felt they were intoxicated by alcohol. Defendants caused police officers to take people into protective custody, and hold them, without regard to whether they were *incapacitated* by alcohol consumption— the legal standard under the protective custody statute. Defendants caused police officers under their control to disregard other requirements of the protective custody statute such as immediately permitting those detained to make a phone call. Defendants' policy of taking and holding people in protective custody without legal justification violated Plaintiffs' constitutional right to be free from unreasonable seizures.

**JURISDICTION**

2. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

**PARTIES**

3. Plaintiff Paul Weldner was at all times relevant to this complaint a resident of Maine. He was twenty-five years old when he was taken into custody.

4. Plaintiff Timothy Dutton was at all times relevant to this complaint a resident of Maine. He was fifty-three years old when he was taken into custody. He is a medical doctor.

5. Plaintiff Michael Burgess was at all times relevant to this complaint a resident of Massachusetts. He was forty-two years old when he was taken into custody. He was and is a sworn full-time municipal police officer in Massachusetts.

6. Plaintiff Lindsey Schmidt was at all times relevant to this complaint a resident of Maine. She was twenty-three years old when she was taken into custody.

7. Defendant Edward T. O'Leary was at all times relevant to this complaint a resident of Massachusetts. He is the police chief of the Town of Foxborough. He is sued in his individual and official capacities for actions taken under color of law.

8. Defendant Town of Foxborough is a duly incorporated town in the Commonwealth of Massachusetts.

**FACTS**

9. Gillette Stadium is located in the Town of Foxborough, Massachusetts. It is the home of the New England Patriots football team. The seating capacity of the stadium is 68,756. In addition to hosting football games, the stadium is used for other sporting events and concerts. Many of the largest concert tours in the United States stop in Foxborough in the summer.

10. The Town of Foxborough and Defendant O'Leary established a policy or custom of instructing Foxborough police officers and officers from other agencies working in Foxborough to take people into custody if they appear to be intoxicated. As explained below, this policy caused police officers to violate the Constitution by seizing class members and holding them in custody without probable cause.

11. In 1971 the state legislature abolished the crime of being drunk in public. Since then, a person cannot be arrested in Massachusetts for being intoxicated. Nor can a person be subject to a civil fine for being intoxicated.

12. At the same time the criminal statute was abolished, the legislature passed M.G.L. ch. 111B, the protective custody statute. Chapter 111B is a public health statute that permits a police officer to take a person into protective custody if the police officer has probable cause to believe the person is incapacitated due to alcohol intoxication. The statute defines incapacitated as the condition of an intoxicated person who, by reason of the consumption of intoxicating liquor, is (1) unconscious, (2) in need of medical attention, (3) likely to suffer or cause physical harm or damage property, or (4) disorderly.

13. If a person is to be held in protective custody, he or she must be offered a breathalyzer test. If the test result is .05 or below, the person cannot be held under the statute

because he or she is not considered intoxicated. For a score of above .05 but below .10, there is no presumption of intoxication. A person is presumed intoxicated if he or she scores .10 or above.

14. A person in Massachusetts cannot legally be placed in protective custody solely because they are intoxicated and their blood alcohol level is above .10.

15. A person cannot legally be placed in protective custody based solely on the fact that he or she fails a field sobriety test or otherwise appears to be intoxicated.

16. A person can lawfully be placed in protective custody only if a police officer has probable cause to believe that the person is incapacitated due to alcohol.

17. Under Defendants' protective custody policy, anyone who police officers felt was intoxicated was subject to being handcuffed and confined in protective custody.

18. Under Defendants' protective custody policy, everyone whose breath test result showed a blood alcohol result of .10 or above would be held in in protective custody.

19. Under Defendants' protective custody policy, anyone who, after being stopped for suspicion of being intoxicated, failed a field sobriety test or otherwise appeared to be intoxicated, was held into protective custody.

20. Defendants instructed police officers acting in Foxborough to take people into protective custody if they appeared to be intoxicated by alcohol, even if they were not incapacitated.

21. Defendants instructed police officers acting in Foxborough to continue to hold people taken into protective custody without regard to whether they were incapacitated.

22. Twice, the Town passed a local bylaw providing a fine for public intoxication. Both proposed bylaws were rejected by the Attorney General's office because they conflicted with state law.

23. Dr. Dutton, a Bruce Springsteen fan, organized a group of approximately fifty people from Portland, Maine, to travel together in a bus to Gillette Stadium to go to the Bruce Springsteen concert on August 18, 2012. The group included Mr. Weldner, as well as other friends, family, and coworkers.

24. During the bus ride to the stadium, Mr. Weldner, Dr. Dutton, and others on the bus watched videos of Bruce Springsteen concerts, listened to his music, and drank alcoholic beverages.

25. The group rented the bus so they could drink alcohol if they wished without worrying about anyone drinking and driving.

26. Plaintiffs did not know that the Town of Foxborough's police department had established an unlawful policy or custom of taking and holding people in protective custody who did not meet the criteria of the protective custody statute but who appeared to the police officer to be intoxicated.

27. Mr. Weldner traveled with his father, stepmother, and a friend. During the bus ride he had some alcoholic beverages. While he could feel the effects of alcohol, he was able to take care of himself. There was no reason to think that he was likely to suffer or cause physical harm or damage property. Nor was he disorderly. He was not unconscious and did not need medical attention. He was not incapacitated by alcohol.

28. As Mr. Weldner walked towards the stadium entrance with his friend, the sidewalk became extremely crowded. Mr. Weldner decided to walk in the street next to the sidewalk, as many others were doing.

29. When Mr. Weldner moved to the street, he tripped and stumbled briefly. He did not fall down or touch anyone.

30. Immediately two police officers grabbed Mr. Weldner and ordered him to put his hands behind his back. They said they were taking him into protective custody because he was "too drunk." The police officers did not have probable cause to believe Mr. Weldner was incapacitated.

31. When Mr. Weldner protested, the police officers said they could hold him for 12 hours without a reason. He was placed in a police wagon. They took him below the stadium to a fenced-in holding area. He repeatedly asked to take a sobriety test. He was never given a sobriety test.

32. Later, Mr. Weldner was taken to a police station where he was placed in a cell. He remained in the cell until after the concert ended. He was in custody for approximately six and a half hours.

33. Mr. Weldner would like to go to a concert at Gillette Stadium, perhaps to finally see Bruce Springsteen, but he is afraid of going to Foxborough until Defendants change their protective custody policy.

34. Dr. Dutton was with his nineteen-year-old daughter and his girlfriend, along with other friends and colleagues.

35. On the bus ride, he drank alcoholic beverages. When they arrived at the stadium he could feel the effects of the alcohol. He was not fit to operate a motor vehicle, but he was capable of conducting himself properly.

36. Dr. Dutton was in the ticket line when security guards or police officers removed his girlfriend from the line. Foxborough police officers placed her in custody. Although she had been drinking, she was not incapacitated by alcohol.

37. Dr. Dutton politely asked why they were taking her into custody since she had not done anything wrong.

38. The officers told him they were taking her into custody. They told Dr. Dutton he would go with her if he did not get back into the line.

39. Dr. Dutton did not get back into the line. The officers placed him in protective custody.

40. There was no reason to think that Dr. Dutton was likely to suffer or cause physical harm or damage property. Nor was he disorderly. He was not unconscious and did not need medical attention. Dr. Dutton was not incapacitated by alcohol.

41. The police officer did not have probable cause to believe that Dr. Dutton was incapacitated.

42. Dr. Dutton was held first in the holding area under the stadium, then in a lock-up cell at the Foxborough police station.

43. When Dr. Dutton took a breath test, it indicated he was not presumed to be intoxicated. Despite this, the police officers refused to release him from custody.

44. Dr. Dutton was held in custody for about six and a half hours, from about 6:30 p.m. until about 1:00 a.m.

45. On August 27, 2011, Mr. Burgess went to Gillette Stadium in Foxborough to attend the New England Country Music Festival with several friends. They tailgated in the parking lot and drank some alcoholic beverages. Mr. Burgess could feel the effects of alcohol, but he was able to take care of himself. There was no reason to think that he was likely to suffer or cause physical harm

to himself or others or to damage property. Nor was he disorderly. He was not unconscious and did not need medical attention. He was not incapacitated by alcohol.

46. At about 7:00 p.m. Mr. Burgess walked towards an entrance to the stadium. Foxborough reserve police officer Timothy Cahill asked him if he had been drinking. Mr. Burgess said he had been drinking. He had finished a drink shortly before this encounter. Officer Cahill took him to a police wagon and had him blow into a preliminary breath testing machine (PBT). Based on the test result, Officer Cahill handcuffed Mr. Burgess and placed him in protective custody. The breath test is not accurate when it is taken shortly after a person has been drinking.

47. As a trained police officer, Mr. Burgess knew that he did not fit the definition of being incapacitated.

48. Mr. Burgess was placed in a police wagon. The wagon picked up several other people then arrived at an area referred to as “the compound” at about 7:30 p.m. The compound was an area near the stadium consisting of cages for holding people.

49. Mr. Burgess went through some processing at the stadium compound and then he was placed in a caged area. He sat on a bench inside the cage with one hand cuffed to a pole. Mr. Burgess observed other people who were being held in protective custody constantly asking to make a phone call. None of them were allowed to make a phone call from the compound. He was booked at the compound about 1:11 a.m. The friends who came to the event with Mr. Burgess were looking for him but the police denied having him in custody.

50. After he was booked, officers transported Mr. Burgess to the Foxborough police station where he was finally allowed to make a phone call. He called the friends who came to the

event with him. His friends were already on their way home. After Foxborough police officers released Mr. Burgess he drove himself home.

51. Mr. Burgess was released from custody at about 4:00 a.m., about nine hours after he was placed in custody.

52. On August 25, 2012 Ms. Schmidt went to Gillette Stadium in Foxborough to attend the New England Country Music Festival with several friends. They tailgated in the parking lot. Ms. Schmidt could feel the effects of alcohol, but she was able to take care of herself. There was no reason to think that she was likely to suffer or cause physical harm to herself or others or to damage property. Nor was she disorderly. She was not unconscious and did not need medical attention. She was not incapacitated by alcohol.

53. Because Ms. Schmidt was wearing cowboy boots, she stumbled briefly as she walked towards the stadium entrance. Quincy police Officer Peter Curley, acting on behalf of the Foxborough Police Department, stopped her and asked her if she had been drinking. She said she had a few drinks. Officer Curley placed Ms. Schmidt in protective custody.

54. The protective custody report describes a person who is merely under the influence of alcohol. The reports claims Ms. Schmidt was unsteady on her feet, had glassy eyes and had a strong odor of alcohol "emitting from her person." The police report does not include any facts indicating that Ms. Schmidt was incapacitated due to intoxication.

55. Ms. Schmidt was handcuffed and taken to a police wagon. The wagon brought her to a holding area at the stadium. She was held there until she was processed. Then she was moved to another caged holding area outside the stadium. She was not permitted to make a phone call while she was being held at the stadium.

56. Eventually Ms. Schmidt was taken to the Foxborough police station. She was finally allowed a phone call at the police station. She called one of her friends who went to the event with her. Ms. Schmidt was released to the custody of her friend after she was confined for over three hours.

57. Each of the named Plaintiffs was placed in protective custody because he or she had been drinking alcohol. While they were feeling the effects of alcohol, none of them and none of the class members were incapacitated as that term is defined in the protective custody statute.

58. Sixty-six people were handcuffed and placed in protective custody pursuant to the Defendants' protective custody policy on August 18, 2012, when Bruce Springsteen played at Gillette Stadium.

59. The following weekend, Gillette Stadium hosted the annual New England Country Music Festival. That weekend, 467 people were placed in protective custody based on the Defendants' protective custody policy or practice.

60. At the New England Country Music Festival in August, 2011, several hundred people were placed in protective custody based on the Defendants' protective custody policy or practice.

61. After the country music festival in 2012, Defendant O'Leary publically stated that the police officers followed the Town's plan in taking people into protective custody.

62. Defendant O'Leary admitted that more people are taken into protective custody at events in Foxborough than at similar events at similar venues throughout the country. This is because of Defendants' policy of unlawfully placing people in custody merely for being intoxicated without being incapacitated.

63. Most of the people taken into custody at the country music festival were not incapacitated as that term is defined in the protective custody statute.

64. In 2011, approximately nine hundred people were placed in protective custody by the Foxborough Police Department at or near Gillette Stadium events pursuant to the Defendants' unlawful policy.

65. People who were taken into protective custody at Gillette Stadium events were not allowed to make a phone call before or after they were taken to the holding areas at the stadium even though the statute requires that people taken into protective custody "shall immediately" have the right to a phone call.

66. Without being able to make a phone call, class members could not arrange to be released from police custody to a sober person.

67. As police chief, Defendant O'Leary is the final policymaker for the Town of Foxborough Police Department. He is responsible for all of the policies, practices, and customs of the department.

68. Defendant O'Leary drafted and implemented the Town's policy for taking people into protective custody.

69. Defendant O'Leary supervised the implementation of the Town's protective custody policy.

70. Defendant O'Leary had read the state protective custody statute.

71. Defendant O'Leary publically stated that the Town of Foxborough had a policy of detaining in protective custody everyone whose breath test score was .10 or above.

72. As a police chief, Defendant O'Leary is charged with knowing and enforcing state law. He knew that a person in Massachusetts could not lawfully be placed in protective custody simply because the person was intoxicated. He knew that a person had to be incapacitated as that term is defined in the statute to be deprived of his or her liberty by being placed in protective custody.

73. Despite this knowledge, Defendant O'Leary created and implemented a policy for the Town of Foxborough that caused police officers in Foxborough to handcuff people and confine them in protective custody even though they were not incapacitated.

**CLASS ACTION ALLEGATIONS**

74. Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure as a class action on behalf of all persons who were taken into protective custody in the Town of Foxborough at or near Gillette Stadium during stadium events pursuant to the protective custody policy of the Town of Foxborough described above.

75. The named Plaintiffs, Paul Weldner, Timothy Dutton, Michael Burgess and Lindsey Schmidt are members of the class. The class represented by Plaintiffs is so numerous that joinder of all such persons is impractical. The policy described above has affected over one thousand class members.

76. There are questions of law and fact common to the class of Plaintiffs. Central to all the claims is the constitutionality of the protective custody policy and practice of the Town of Foxborough.

77. The named Plaintiffs' claims or defenses are typical of the claims or defenses of the class of plaintiffs.

78. The named Plaintiffs will fairly and adequately represent and protect the interests of the members of the class. Counsel for the Plaintiffs is experienced and capable in civil rights litigation. Class counsel has successfully represented plaintiffs in other criminal justice class actions alleging constitutional violations. Counsel has the resources and expertise to prosecute this action.

79. This action is properly maintainable as a class action because the prosecutions of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants.

80. This action is properly maintainable as a class action because the prosecution of separate actions would create a risk of adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members who are not parties or would substantially impair or impede their ability to protect their interests.

81. This action is properly maintainable as a class action because the questions of law and fact common to the class predominate over any questions affecting only individual class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

82. As a direct result of the policy or practice as described above, class members were unlawfully handcuffed and held in custody for many hours. This caused each member of the class to endure emotional distress and humiliation. In addition, most class members were unable to enjoy the event they planned to attend.

**CLAIMS**

**Count One: 42 U.S.C. § 1983, Fourth and Fourteenth Amendments – Liability of Defendant O'Leary**

83. The above paragraphs are incorporated herein.

84. Defendant O'Leary caused Plaintiffs and the members of the Plaintiff class to be seized without probable cause. He caused Plaintiffs and members of the Plaintiff class to be subject to an unreasonable seizure of their persons.

85. As a direct and proximate result of this conduct, Plaintiffs and the Plaintiff class have suffered injuries as described above.

**Count Two: 42 U.S.C. § 1983, Fourth and Fourteenth Amendments – Liability of the Town of Foxborough**

86. The above paragraphs are incorporated herein.

87. The policies and practices of the Defendant Town of Foxborough were the moving force behind the violation of Plaintiffs' and the Plaintiff class's constitutional right not to be subject to an unreasonable seizure of their persons.

88. As a direct and proximate result of this conduct, Plaintiffs and the members of the Plaintiff class have suffered injuries as described above.

**WHEREFORE,** Plaintiffs request that this Court:

(a) Award compensatory damages and punitive damages to the named Plaintiffs and to the members of the Plaintiff class;

(b) Issue a declaratory judgment finding Defendants' protective custody policy is unconstitutional and enjoin Defendants from enforcing the policy;

(c) Award Plaintiffs the costs of this action including reasonable attorney's fees; and

(d) Award whatever additional relief this Court deems necessary and appropriate.

**JURY DEMAND**

A jury trial is hereby demanded.

RESPECTFULLY SUBMITTED,

/s/Howard Friedman
Howard Friedman, BBO #180080
**Law Offices of Howard Friedman, P.C.**
90 Canal Street, 5th Floor
Boston, MA 02114-2022
617-742-4100
hfriedman@civil-rights-law.com

/s/ David Milton
David Milton, BBO #668908
**Law Offices of Howard Friedman, P.C.**
90 Canal Street, 5th Floor
Boston, MA 02114-2022
617-742-4100
dmilton@civil-rights-law.com

Date: November 12, 2012